

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-25-00004-CV

---

IN THE INTEREST OF C.C., A CHILD

---

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 92377

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Opinion by Justice Rambin

# OPINION

Mother appeals the trial court's order terminating her parental rights to her child, C.C.,[1] who was nine years old when the Texas Department of Family and Protective Services removed him from the home.[2] The trial court found that the Department had proved four statutory grounds that authorize termination of parental rights: ground D (endangering conditions or surroundings), ground E (endangering conduct), ground I (disobeying order facilitating investigation of abuse or neglect), and ground P (endangering use of controlled substance). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (I), (P) (Supp.). The trial court also found that termination of parental rights was in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (Supp.).

Mother argues that the evidence is legally and factually insufficient to support both (1) termination under grounds D, E, and I and (2) the trial court's finding that termination of parental rights was in the child's best interest. Mother does not challenge the trial court's finding under ground P.

On accelerated review,[3] we find that legally and factually sufficient evidence supported the trial court's termination under grounds D and E, as well as the trial court's best-interest finding. We affirm the trial court's judgment terminating Mother's parental rights.

---

[1]We use initials, pseudonyms, or descriptive terms such as Mother to protect the identity of the child. *See* TEX. R. APP. P. 9.8(b).

[2]C.C.'s father is deceased.

[3]*See* TEX. FAM. CODE ANN. § 263.405; TEX. R. APP. P. 28.4; TEX. R. JUD. ADMIN. 6.2(a); *In re D.S.*, 602 S.W.3d 504, 512 (Tex. 2020) ("As we have long acknowledged, children's lives cannot be 'kept in limbo while judicial

2

## I. Standard of Review

We begin with the statutory burden of proof in the trial court because "the burden of proof at trial necessarily affects appellate review of the evidence." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

### A. The Clear and Convincing Burden of Proof in Termination Cases

In the trial court, the party seeking termination of parental rights bears a clear and convincing burden of proof. TEX. FAM. CODE ANN. § 161.001(b) (Supp.). "[C]lear and convincing evidence . . . 'will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re R.J.G.*, 681 S.W.3d 370, 379 (Tex. 2023) (quoting TEX. FAM. CODE ANN. § 101.007). Here, the party seeking termination is the Texas Department of Family and Protective Services. In the trial court, the Department bore the burden to show by clear and convincing evidence a statutory basis for termination.[4] The Department also bore the burden to show by clear and convincing evidence that termination was in the best interest of the child.[5] The "factfinder," in this instance the trial court, was tasked with assessing whether the Department had carried its burdens: "[t]o terminate parental rights, the *factfinder* must find by clear and convincing evidence that (1) at least one of the termination grounds set forth in Section 161.001(b)(1) or other sections of the Texas Family Code applies,

processes crawl forward[.]'" (alteration in original) (quoting *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003) ("In termination cases, judicial economy is not just a policy—it is a statutory mandate."))).

[4]"To terminate parental rights, the Legislature requires the Department to establish by clear and convincing evidence at least one of the predicate findings under Family Code Section 161.001(b)(1)." *In re R.J.G.*, 681 S.W.3d at 377; *see also* TEX. FAM. CODE ANN. § 161.003(a)(1)–(4).

[5]"[R]egardless of which predicate it asserts to justify termination, the Department must also prove by clear and convincing evidence that termination is in the child's best interest." *In re R.J.G.*, 681 S.W.3d at 377; *see also* TEX. FAM. CODE ANN. § 161.003(a)(5).

and (2) termination is in the best interest of the child." *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam) (emphasis added).

## B.  "[W]ith a healthy regard for the constitutional interests at stake"

On appellate review, we are tasked with "undertak[ing] 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d at 26). Therefore, we examine the constitutional foundation of the clear and convincing burden.

The clear and convincing burden of proof in termination cases has a foundation deeper than statutory law—a constitutional foundation. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020) (per curiam).[6] The statutory clear and convincing burden of proof in termination of parental rights cases was created in 1983,[7] *after* the Texas Supreme Court, in 1980,[8] and the United States Supreme Court, in 1982,[9] held that the clear and convincing burden of proof is constitutionally required in termination cases. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Consequently, the

---

[6]"In parental termination cases, due process mandates a clear and convincing evidence standard of proof." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam). "A parent's 'right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right.'" *In re A.C.*, 560 S.W.3d 624, 629–30 (Tex. 2018) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)). "[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see In re R.R.A.*, 687 S.W.3d 269, 284 (Tex. 2024) (Blacklock, J., dissenting) (citing *In re A.M.*, 630 S.W.3d 25, 25 (Tex. 2019) (Blacklock, J., concurring in denial)) ("Parents and their children are 'bound together by natural ties deeper and stronger than any law.'" (quoting *In re A.M.*, 630 S.W.3d 25, 25 (Tex. 2019) (Blacklock, J., concurring in denial))); *see also In re G.X.H.*, 627 S.W.3d 288, 302 (Tex. 2021) (Guzman, J., concurring, joined by Busby, J.) ("The parent-child relationship is so important and so precious that the highest constitutional protection is afforded to the family decision-making process.").

[7]*See* Act of May 26, 1983, 68th Leg., R.S., ch. 298, § 2, 1983 Tex. Gen. Laws 1554, 1555 (former TEX. FAM. CODE § 11.15), *recodified by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, sec. 161.001, 1995 Tex. Gen. Laws 113, 212 (current version at TEX. FAM. CODE § 161.001(b)).

[8]*See In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

[9]*See Santosky*, 455 U.S. at 769.

"heightened standard of [appellate] review is mandated not only by the Family Code . . . but also the Due Process Clause of the United States Constitution." *In re Z.N.*, 602 S.W.3d at 545 (quoting *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012)).

### 1.    The Constitutional Rights of Parents

Roughly a century ago, the United States Supreme Court described the parent-child relationship as a fundamental liberty interest with a foundation deeper and older than the Constitution. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (including, for Fourteenth Amendment "liberty" purposes, the right to "bring up children," among "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men").[10]

The late Justice Scalia traced the rights of parents to the deepest of sources: "In my view, a right of parents to direct the upbringing of their children is among the 'unalienable Rights' with which the Declaration of Independence proclaims 'all men . . . are endowed by their Creator.'" *Troxel v. Granville*, 530 U.S. 57, 91 (2000) (Scalia, J., dissenting) (plurality op.).

---

[10]Long "recognized at common law" is a way of saying that the right was already recognized before the drafting of the Constitution:

> The language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted. The statemen and lawyers of the Convention who submitted it to the ratification of the Convention of the Thirteen States, were born and brought up in the atmosphere of the common law, and thought and spoke in its vocabulary. They were familiar with other forms of government, recent and ancient, and indicated in their discussions earnest study and consideration of many of them, but when they came to put their conclusions into the form of fundamental law in a compact draft, they expressed them in terms of the common law, confident that they could be shortly and easily understood.

*Ex parte Grossman*, 267 U.S. 87, 108–09, 111 (1925) (orig. proceeding); *see Parham v. J.R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.").

But *Troxel* brings us to a debate among constitutional scholars. There is no provision in the Constitution that says, in so many words, "The rights of parents are as follows . . . ." *See id.* at 92 (Stevens, J., dissenting) ("a Constitution that does not even mention them").[11] As a result, prior to *Troxel*, "[t]he integrity of the family unit . . . found protection in the Due Process Clause of the Fourteenth Amendment, . . . the Equal Protection Clause of the Fourteenth Amendment, . . . and the Ninth Amendment." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (citations omitted). In *Troxel*, the United States Supreme Court generally agreed that parents have constitutional rights but differed on precisely where and how those rights are protected in and by the Constitution. *Troxel*, 530 U.S. at 65, 75 (Souter, J., concurring), 80 (Thomas, J., concurring), 81 (Stevens, J., dissenting), 91 (Scalia, J., dissenting), 94 (Kennedy, J. dissenting).

The Texas Supreme Court has acknowledged that there is a debate about the *source* of the parental rights but has held that the *existence* of those rights is beyond debate. *Stary v. Ethridge*, 712 S.W.3d 584, 588 n.6 (Tex. 2025) ("Debates regarding the precise textual sources of that *well-recognized* right are not at issue here." (emphasis added)).

> One thing is certain, the right of parents to raise their children is "fundamental":
>
> A majority of the *Troxel* Court found protection for this fundamental right— "perhaps the oldest of the fundamental liberty interests recognized by this Court"—within the Fourteenth Amendment. The parties in this case do not disavow that protection. And the justices in *Troxel* who might not root this right in substantive-due-process jurisprudence nevertheless similarly recognized a "fundamental right of parents to direct the upbringing of their children."

---

[11]Justice Scalia would have used the Ninth Amendment as a bar to federal intrusion into this sphere and would have entrusted the states to protect the rights of parents. *Troxel*, 530 U.S. at 91–92; *see Santosky*, 455 U.S. at 770 (Rehnquist, J., dissenting) ("This area [of family law] has been left to the States from time immemorial, and not without good reason.").

*In re C.J.C.*, 603 S.W.3d 804, 812 (Tex. 2020) (orig. proceeding) (footnote omitted) (quoting

*Troxel*, 530 U.S. at 65, 80).

Consequently, we are guided by the Texas Supreme Court's summary of the parental

rights holdings of the United States Supreme Court:

> The United States Supreme Court has long held that the Constitution "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." [(quoting *Troxel*, 500 U.S. at 66).] This recognition stems from "a strong tradition of parental concern for the nurture and upbringing of their children." [(quoting *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)).] The Supreme Court's jurisprudence rejects "any notion that a child is 'the mere creature of the State,'" but instead holds "that parents generally 'have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.'" [(quoting *Parham*, 442 U.S. at 602).] Accordingly, "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." [(quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).]

*In re C.J.C.*, 603 S.W.3d at 811–12 (third alteration in original) (footnotes omitted).[12]

Expressed succinctly, "[i]n the termination context, the United States Supreme Court has

described a parent's private interest as a 'commanding' one because the government seeks to end

her exercise of a fundamental right." *Stary*, 712 S.W.3d at 592 (quoting *In re J.F.C.*, 96 S.W.3d

at 273 (quoting *Santosky*, 455 U.S. at 759)).

Further, parents have rights under the "due course of the law" provision of the Texas

Constitution. TEX. CONST. art. I, § 19; *In re N.G.*, 577 S.W.3d at 235 ("A parent may be denied

the fundamental liberty interest in parenting only after they have been provided due process and

due course of law . . . ."). "[W]hen the State seeks a parental termination order or other action

---

[12]*In re C.J.C.* was not a termination case but instead dealt with a motion to modify custody brought by a grandparent. *In re C.J.C.*, 603 S.W.3d at 820. Nonetheless, an examination of the constitutional rights of a fit parent was necessary to the resolution of the case. *Id.* (Lehrmann, J., concurring).

7

that 'permanently sunders those ties,' those proceedings should be 'strictly scrutinized.'" *State v. Loe*, 692 S.W.3d 215, 228 (Tex. 2024) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

### 2. Constitutional Balancing

As set forth above, *In re C.J.C.* held that the constitutional rights of parents to bring up their children is "coupled with [a] high duty" from parent to child. *In re C.J.C.*, 603 S.W.3d at 811–12. "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also *essential* that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26 (emphasis added). Therefore, "in parental termination cases, the parents' fundamental interest in maintaining custody and control of their children is *balanced against* the State's fundamental interest in protecting the welfare of the child." *In re A.B.*, 437 S.W.3d at 505 (emphasis added).[13]

### 3. The Constitutional Interests of the Child and the State

"The purpose of terminating parental rights . . . is not to punish parents or deter their 'bad' conduct, but rather to protect the interests of the child." *Id.* at 504. "Like their parents, children have a compelling interest in finality and stability." *In re D.S.*, 602 S.W.3d at 512. "Two state interests are at stake in parental rights termination proceedings—a *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative

---

[13]"[C]ourts must not sacrifice a child's emotional and physical well-being to preserve [parental] rights when their corresponding obligations go unfulfilled for years." *In re J.F.-G.*, 627 S.W.3d 304, 317 (Tex. 2021) (citing *In re C.H.*, 89 S.W.3d at 26); s*ee Meyer*, 262 U.S. at 399 ("*orderly* pursuit of happiness" (emphasis added)).

interest in reducing the cost and burden of such proceedings." *Santosky*, 455 U.S. at 766. "The State's fundamental interest in parental-rights termination cases is to protect the best interest of the child." *In re M.S.*, 115 S.W.3d 534, 548 (Tex. 2003). "This interest is aligned" with the child's "interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged." *Id.* "[T]he State's interest in protecting the welfare of the child must initially manifest itself by working toward *preserving* the familial bond, rather than severing it." *Id.* at 548 (citing *Santosky*, 455 U.S. at 766–67). "Once it is clear that the parent cannot or will not provide a safe, stable family environment, then the State's interest in protecting the welfare of the child shifts to establishing that safe, stable, and permanent environment for the child elsewhere." *Id.* In sum, "[b]ut for the State's fundamental interest in the welfare of the child, termination would not be proper." *In re A.B.*, 437 S.W.3d at 505.

The interests of the child and the State are typically expressed as being an inherent part of the analysis of the parent's rights. *See In re J.W.*, 645 S.W.3d 726, 753 (Tex. 2022) (Young, J., concurring) ("[T]he very sanctity of the parent-child relationship entails the need for an escape hatch if things go terribly wrong."). Consequently, along with the parent's rights, we likewise consider the interests of the child and the State "with a healthy regard" as a matter of constitutional import. *In re A.B.*, 437 S.W.3d at 503 ("with a healthy regard for the constitutional *interests* at stake" (quoting *In re C.H.*, 89 S.W.3d at 26) (emphasis added)).

## C.    The Constitutional Appellate Standard of Review

"[T]he appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25.

This appellate standard of review was shaped by the constitutional requirement of a clear and convincing burden of proof at trial: "[a]s a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* Hence "[a] correspondingly searching standard of appellate review is an essential procedural adjunct." *In re A.C.*, 560 S.W.3d at 630.

The Texas Supreme Court adopted the "reasonably form a firm belief or conviction" standard of review for *factual* sufficiency in 2002. *In re C.H.*, 89 S.W.3d at 25. The Texas Supreme Court observed, "While *G.M.* and *Santosky* established that the burden of proof in termination proceedings is clear and convincing evidence, neither decision indicated how appellate courts are to review findings based on that burden of proof." *Id.* at 23. Given the higher burden of proof at trial, the Texas Supreme Court adopted the "reasonably form a firm belief or conviction" standard for factual sufficiency review. *Id.* at 25.[14] In doing so, the Texas Supreme Court rejected the use of the "traditional" factual sufficiency standard, under which "a court determines if a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias." *Id.* at 25, 26.

---

[14]"We do not have jurisdiction to conduct a factual sufficiency review, but we may ensure that the courts of appeals adhere to the proper legal standard of review." *In re C.H.*, 89 S.W.3d at 28; *see* TEX. CONST. art. V, § 6(a) (providing that "the decision of said courts [of appeal] shall be conclusive on all questions of fact brought before them on appeal or error").

On the other hand, "[a]n appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *Id.* at 26.

Later in 2002, the Texas Supreme Court adopted "reasonably form a firm belief or conviction" for use in *legal* sufficiency review as well: "legal sufficiency review . . . take[s] into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof." *In re J.F.C.*, 96 S.W.3d at 265–66. In doing so, the Texas Supreme Court rejected the traditional legal sufficiency "no evidence" test for use in termination cases: "[r]equiring only '[a]nything more than' a mere scintilla of evidence does not equate to clear and convincing evidence." *Id.* at 265 (second alteration in original).

Thus, the "reasonably form a firm belief or conviction" standard cannot be so lax as to permit affirmance of a termination merely because there is a scintilla of evidence (the rejected legal sufficiency approach), or because the evidence clears the traditional factual sufficiency hurdle (the rejected factual sufficiency approach). *Id.* at 264–65 (quoting *In re C.H.*, 89 S.W.3d at 25). Nor is the standard so stringent as to require reversal unless there is proof beyond a reasonable doubt (another rejected factual sufficiency benchmark). *In re C.H.*, 89 S.W.3d at 26.

This standard of appellate review announced in 2002 remains the law. *In re R.R.A.*, 687 S.W.3d at 276 (quoting *In re C.H.*, 89 S.W.3d at 25).

### 1. Legal Sufficiency

Though "reasonably form a firm belief or conviction" is the standard for both legal and factual sufficiency review, there is a difference between legal and factual sufficiency. *In re A.C.*, 560 S.W.3d at 630–31. For legal sufficiency, the review is as follows:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.
>
> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*In re J.F.C.*, 96 S.W.3d at 266.

### 2. Factual Sufficiency

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at 630. "In conducting a *legal*-sufficiency review, the reviewing court cannot ignore undisputed evidence

12

contrary to the finding, but must otherwise *assume the factfinder resolved disputed facts in favor of the finding.*"  *Id.* at 630–31 (emphasis added).[15]  By comparison:

> Factual sufficiency . . . *requires weighing disputed evidence contrary to the finding* against all the evidence favoring the finding.  In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding.  Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true.

*Id.* at 631 (emphasis added) (footnote omitted) (citation omitted).

Under this approach, "[t]he assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so remains."  *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020).

> However, rather than "disregard[ing]" disputed evidence that a reasonable factfinder could not have credited in favor of the finding, the court must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true."

*Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

### 3. Deference to the Fact-Finder

Deference to the fact-finder is embedded in our review:  "[w]e have . . . rejected traditional formulations of legal- and factual-sufficiency standards in favor of standards that *honor* not only the elevated burden of proof, but also the *deference* an appellate court *must have*

---

[15]"Weighing *conflicting* evidence and inferences to determine whether a verdict should be vacated . . . is appropriately a part only of the reviewing court's factual sufficiency review . . . ."  *In re J.O.A.*, 283 S.W.3d 336, 347 (Tex. 2009) (emphasis added).  That is not to say that legal sufficiency review is entirely devoid of weighing: "[d]isregarding *undisputed* facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence."  *In re J.F.C.*, 96 S.W.3d at 266 (emphasis added).

13

for the *factfinder*'s role." *In re A.C.*, 560 S.W.3d at 630 (emphasis added). "[T]he trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)).[16] Little wonder then that deference for the fact-finder is a matter of constitutional importance in termination cases: "We emphasize that, as appellate courts apply the standard we announce today, they must maintain the respective constitutional roles of juries and appellate courts." *In re C.H.*, 89 S.W.3d at 26.

The Texas Supreme Court stated,

> A factual sufficiency review pits two fundamental tenets of the Texas court system against one another: the right to trial by jury[17] and the court of appeals' exclusive [appellate] jurisdiction over questions of fact. And, in the context of parental termination cases, a third interest must also be accounted for—that is, parents' fundamental right to make decisions concerning "the care, the custody, and control of their children."

*In re A.B.*, 437 S.W.3d at 502 (footnotes omitted) (citations omitted) (quoting *Troxel*, 530 U.S. at 65). "Indeed, our courts of appeals walk a very fine line in conducting an appropriate factual sufficiency review." *Id.* at 503. "Thus, in *In re C.H.*, [the Texas Supreme Court] articulated a

---

[16]*In re J.J.R.S.* was a conservatorship case involving review of a best-interest finding. *In re J.J.R.S.*, 627 S.W.3d at 218.

[17]When the trial court is the fact-finder, its determinations are likewise entitled to deference. *In re J.F.-G.*, 627 S.W.3d at 317 ("That [legal sufficiency] standard requires us to defer to the trial court's judgment of the credibility of the witnesses in a bench trial, even in parental termination cases.").

factual sufficiency standard to strike an appropriate balance between these competing principles." *Id.* at 502 (citing *In re C.H.*, 89 S.W.3d at 25).[18]

"Reviewing courts . . . must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence." *In re R.R.A.*, 687 S.W.3d at 279 n.50. "Such inferences must be reasonable and based on other facts proved." *Id.* "Our opinion does not render the clear-and-convincing-evidence standard toothless; instead, it properly defers credibility determinations to factfinders at the trial court level, who most closely interact with the witnesses." *Id.* at 279.

---

[18]*In re Commitment of Stoddard* sheds light on the operation of civil factual sufficiency review. *In re Commitment of Stoddard*, 619 S.W.3d at 675–76. Deference to the fact-finder is imbedded in civil factual sufficiency review, but as the burden of proof in the trial court rises, "the possibility that the evidence in a particular case will be legally sufficient but factually insufficient essentially decreases." *Id.* at 676 (quoting *In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied)). That possibility, though, does not vanish. *Id.* *In re Commitment of Stoddard* dealt with civil commitment based on a sexually violent predator finding, "the rare civil case in which the burden of proof is beyond a reasonable doubt." *Id.* at 668. "Drawing from" the standard in termination cases, the court held that "a properly conducted factual-sufficiency review in an SVP case requires the court of appeals to determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is an SVP." *Id.* For legal sufficiency purposes, this civil standard is "consistent with" the criminal standard of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 675 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Factual sufficiency is another matter. For criminal cases, the Texas Court of Criminal Appeals has held that legal and factual sufficiency have merged. *Id.* (citing *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.)). This is because factual sufficiency was done viewing the evidence in a "neutral" light, which was in conflict with, and yielded to, deference to the role of the fact-finder: "the required deference to jury determinations of weight and credibility" required the "'eliminat[ion of] . . . viewing the evidence in a 'neutral light' component of a factual-sufficiency standard,' rendering it 'indistinguishable' from the legal-sufficiency standard." *Id.* (quoting *Brooks*, 323 S.W.3d at 902). In contrast to the former "neutral light" review of criminal cases, in civil factual sufficiency review, "[t]he assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so remains." *Id.* at 674 (citing *In re J.F.C.*, 96 S.W.3d at 266). It is with this assumption still in place that a reviewing court of appeals "considers whether that evidence, in light of the entire record, is so significant that the factfinder could not have determined beyond a reasonable doubt that the statutory elements were met." *Id.* at 676 (citing *In re J.F.C.*, 96 S.W.3d at 266). The court therefore declined to merge *civil* legal and factual sufficiency: "we hold that the 'right of courts of appeals to review for factual insufficiency' under the standard expressed herein 'must continue undisturbed.'" *Id.* (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986)).

### 4. Detailed Appellate Opinions Because of Deference to Fact-Finders

"A court of appeals should detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding." *In re J.F.C.*, 96 S.W.3d at 266–67. "[T]he effort of detailing the evidence is required of the courts of appeals when reversing a jury verdict to discourage the reviewing court from 'merely substituting its judgment for that of the jury.'" *In re A.B.*, 437 S.W.3d at 503 (quoting *Ellis Cnty. State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex. 1994)). "This is not to suggest that courts of appeals should not detail the evidence in their opinions affirming a jury's decision to terminate. . . . But . . . we decline to mandate that courts of appeals detail the evidence when affirming a jury verdict." *Id.* at 505 (citation omitted); *see In re L.G.*, 596 S.W.3d 778, 780 (Tex. 2020) (per curiam).

### D. Constitutionally Mandated Considerations of Grounds D and E

In termination cases, the constitutional stakes impact not only our approach to appellate review, but also which grounds for termination we review.

Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam) (quoting *In re N.G.*, 577 S.W.3d at 232).

Grounds D and E deal with child endangerment. *In re R.R.A.*, 687 S.W.3d at 276–77.[19] Termination on grounds D or E "has consequences for termination of parental rights as to children in a future proceeding." *In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019) (per curiam); *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (making it a ground for termination when a parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state").

Therefore, "due process and due course of law require that the court of appeals review the legal and factual sufficiency of the evidence supporting a trial court's order of termination under Subsections 161.001(b)(1)(D) and (E) when challenged on appeal." *In re M.P.*, 639 S.W.3d at 704; *In re J.W.*, 645 S.W.3d at 748 ("[W]e may not bypass [Mother's] evidentiary challeng*es* to Subsections (D) *and* (E), the so-called endangerment grounds." (emphasis added)).

### E.     Holistic Review of Grounds D and E

Appellate review of termination on endangerment grounds must be conducted in a "holistic" fashion. *In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) (per curiam) (orig. proceeding) ("holistic endangerment review set forth in [*In re*] *R.R.A.*"); *see In re R.R.A.*, 687 S.W.3d at 278.

As used in the parental-rights termination statutes, "'endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Although '"endanger" means more than a threat of metaphysical injury or the possible ill effects

---

[19]"A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being—the focus of grounds (D) and (E) . . . ." *In re R.R.A.*, 687 S.W.3d at 277 (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987)).

of a less-than-ideal family environment,' it does not require that there be conduct 'directed at the child' or that 'the child actually suffer[] injury.'" *In re J.W.*, 645 S.W.3d at 748 (alteration in original) (quoting *Boyd*, 727 S.W.2d at 533).[20]

There are any number of considerations in the endangerment analysis. For example, drug use or parental incarceration may play a part in endangerment. *In re R.R.A.*, 687 S.W.3d at 278 (drug use); *In re J.F.-G.*, 627 S.W.3d at 316 (incarceration). The question becomes how to approach these myriad considerations.

Regarding drug use, the Texas Supreme Court has instructed:

> While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use *accompanied by* circumstances that indicate related dangers to the child can establish a substantial *risk* of harm. A reviewing court *should not evaluate drug-use evidence in isolation*; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's "ability to parent."

*In re R.R.A.*, 687 S.W.3d at 278 (all but second emphasis added) (quoting *In re J.O.A.*, 283 S.W.3d at 345); *In re A.V.*, 697 S.W.3d at 659.[21]

---

[20]The meaning of endangerment has been the subject of several recent dissents in the Texas Supreme Court decrying the "expansive approach to the pivotal statutory word 'endangered.'" *In re R.R.A.*, 687 S.W.3d at 283–84 (Blacklock, J., dissenting, joined by Busby, J.); *In re N.L.S.*, No. 23-0965, 2025 WL 1687924, at *5 (Tex. June 13, 2025) (Blacklock, C.J., joined by Devine, J., and Sullivan, J., dissenting) (per curiam).

[21]In *In re A.V.*, the Texas Supreme Court declined review (and thereby permitted endangerment termination to stand) based on these facts:

> The parents used drugs together during Mother's pregnancy and while caring for Mother's teenage daughter. Mother tested positive for drugs three times during her pregnancy. Drug use during pregnancy supports a finding of direct injury to the child. After the child in question was born, the parents did not complete their court-ordered services, including drug testing and refraining from drug use. Attendance at their two-hour weekly visitation with the child was sporadic. Father testified that the best way for the parents to stop using drugs was to return the child to them. The evidence supports a finding that the parents' drug use continued despite their knowledge that their parental rights were subject to termination for continued drug use.

18

The approach to endangerment review set forth in *In re R.R.A.* is not limited to drug use. *In re N.L.S.*, 2025 WL 1687924, at *3 ("Father argues that [*In re*] *R.R.A.* is limited to drug-use cases. That is incorrect.").

Consequently, we review endangerment findings considering the "aggregate weight" of factors supported by the evidence. *In re R.R.A.*, 687 S.W.3d at 281 (finding that termination on grounds D and E was supported by "the aggregate weight of Father's ongoing drug use, homelessness, employment instability, and near-complete abandonment of his children for the six months preceding trial").[22]

### F.  Review of Best Interest

"In *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), we gave a *nonexhaustive* list of factors that should be considered when determining the best interest of a child." *In re A.A.*, 670 S.W.3d 520, 534 n.57 (Tex. 2023) (emphasis added). The listed factors are:

> (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) their plans for the child; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976)).

---

*In re A.V.*, 697 S.W.3d at 659.

[22]This appears to be a reference to the "aggregate weight" when conducting *legal* sufficiency review; *In re R.R.A.* makes no mention of factual sufficiency. *In re R.R.A.*, 687 S.W.3d at 281.

19

"[T]he inquiry is whether, on *the entire record*, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest . . . ." *In re C.H.*, 89 S.W.3d at 28 (emphasis added).

In other words, the *Holley* factors are not a checklist:

> [W]e have never held that these considerations are exhaustive, or that *all* such considerations must be proved as a condition precedent to parental termination. The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child. Other cases, however, will present more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice to uphold the jury's finding that termination is required.

*Id.* at 27.

Consequently, the fact-finder may choose to give greater weight to one factor over others. *Id.* (upholding the trial court's finding that termination was in the child's best interests where five *Holley* factors were "lacking" in the view of the court of appeals, but there was "undisputed" evidence of the father's "historical deficiencies in parenting and current criminal proclivities").

## II. The Termination Findings

In her first issue, Mother asserts that the evidence is legally and factually insufficient to support the trial court's findings terminating her parental rights under statutory grounds D and E. In her second issue, Mother asserts the same with respect to ground I.

### A. Endangerment Grounds D and E

Ground D permits termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . knowingly placed or knowingly allowed the child

20

to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Ground E permits termination of parental rights "if the court finds by clear and convincing evidence . . . that the parent has . . . engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

"The grounds for termination are not mutually exclusive; rather, the same conduct may support multiple grounds . . . ." *In re J.F.-G.*, 627 S.W.3d at 314.[23]

## B. The Evidence

The evidence relevant to the trial court's grounds D and E findings showed that the Department became involved in this matter after a police raid in early fall of 2023 was "conducted on the home due to a possible theft ring and guns in the home by other occupants of the home." Although an allegation of neglectful supervision was ruled out at that time, due to noncompliance during the investigation, Mother was ordered to participate in Family Based Safety Services (FBSS) on December 6, 2023.[24] Mother was ordered to complete parenting classes, counseling, a psychosocial evaluation, a substance-abuse assessment, and random drug tests.

In early February 2024, the Department sought emergency removal of C.C. from the home. The FBSS caseworker averred that Mother and C.C. had been moving between a home

---

[23]The same evidence may also support "a finding that termination of a parent's rights is in the child's best interest." *In re J.F.-G.*, 627 S.W.3d at 314.

[24]At the final hearing, the trial court, without objection, took judicial notice of all prior matters in the case, including the FBSS matter. *See In re I.V.*, 61 S.W.3d 789, 795 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.) (concluding that the appellant waived its argument that the trial court could not take judicial notice of its file because the appellant failed to object at trial), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d at n.39.

Mother and C.C. shared with a roommate, her roommate's mothers house, and a motel. Mother stated she and C.C. would soon be moving to Oklahoma. Although the Department visited Mother and C.C. at their residence, Mother would not allow the Department to enter the home. Mother admitted to smoking marihuana and signed an acknowledgment of use. Mother and C.C. missed scheduled counseling appointments. Mother unenrolled C.C. from a school that would have provided him with bus transportation and enrolled him instead in a school where Mother was concerned "that he could not attend as she did not have transportation." Mother also said C.C. could not attend school because he had lice. The Department provided Mother with lice kits, yet two weeks later, C.C. was still not in school. C.C. did not attend school from December 2023 to February 2024. The trial court determined the circumstances warranted emergency removal, C.C. was removed from the home, and the Department was named temporary sole managing conservator.

One month later, in March 2024, the trial court held a hearing on the Department's managing conservatorship of C.C.[25] The Department, through the FBSS caseworker, expressed concern for Mother's slowness in working services and for marihuana use, C.C. not being in school, and Mother's failure to provide stable housing. Mother had tested positive for marihuana the week before the hearing, and C.C. had not been allowed to see Mother since his removal due to her marihuana use. C.C. was having "a hard time emotionally being away from her[,]" but Mother was not to be allowed any in-person visits before she provided a clean urinalysis. Mother testified C.C. had missed "a bunch" of school the previous year because they had been

---

[25]At the final hearing, the trial court took judicial notice of the conservatorship matter.

22

moving back and forth between two towns, and she held him back a year. At that time, Mother and her roommate had just gotten a car, and Mother was working two jobs. Mother stated that, although she was staying in a motel, she had money for a house, and she was looking for one. The Department was appointed temporary managing conservator of C.C. on March 14, 2024.

The trial court held a status hearing on April 3, 2024. The Department's representative requested that Mother's service plan be made an order of the court. The plan required Mother to complete substance abuse screening, counseling, parenting classes, a psychological evaluation, and random drug testing. The Department said Mother had been able to visit with C.C. over FaceTime. The Department reported that Mother's previous urinalysis showed a very low level of marihuana. The Department expressed concerns about Mother's roommate and the children in the home where Mother had been staying. The Court Appointed Special Advocate (CASA) volunteer further explained that she had visited the home during the school day, that underage children were present, one being fourteen, and that one had a vape. The CASA volunteer said she "kn[e]w one of the kids and they get in trouble a lot," and she was "concerned if [C.C.] [came] back that he [would] be running with this crowd." The CASA volunteer said to her knowledge the other children in the home had also been a concern at the beginning of this case.

At the April hearing, Mother testified that she had completed her substance abuse assessment. Mother stated her roommate's children who were home during the school day were supposed to be working toward their GEDs and had "no connection to [her] child, as he [was] nine years old and they [were] 16, not 14." Mother expressed frustration with the Department, stating that she had "spent all [her] money getting into this house[,]" that she couldn't afford to

23

live by herself, and that, if she had known the other children had been a concern since the beginning of the case, she would have tried to get her own house then.

The next hearing in the record, the termination hearing, took place on January 8, 2025. At the termination hearing, the State represented that the Department had not had any contact with Mother between the first hearing and December. The Department's FBSS worker recounted the initial allegations of noncompliance with an investigation that led to Mother's order to participate in FBSS. The FBSS caseworker testified that, of the required FBSS services—"parenting, counseling, a drug and alcohol assessment, random drug screenings, and a psychosocial"—Mother only set up an appointment for counseling, but she did not complete that. Near the end of the FBSS case, Mother scheduled a drug and alcohol assessment, which she completed after the Department became managing conservator of C.C. Mother told the caseworker that she was unable to complete services due to a lack of transportation and access to a good phone. The FBSS caseworker testified that Mother did not work during the FBSS time period.

The FBSS caseworker testified that the Department sought FBSS because parenting and counseling had been discussed with Mother during the investigation, and though Mother agreed to allow C.C. to participate in counseling through school, Mother "felt that counseling or parenting was not needed for her." The FBSS worker also testified that there was concern because Mother had stated "those younger boys who were in the home during the raid would be helping babysit [C.C.] while she went to work." The FBSS worker stated that C.C. missed forty days of school between December 2023 and February 2024.

24

A permanency specialist with 4Kids4Families[26] testified that Mother had been asked to complete "[c]ounseling, a psychological, drug testing, a drug assessment[,] and parenting classes" during the conservatorship portion of the case. The caseworker testified Mother had "completed nothing" and relayed the results of three drug tests to the court: in February and March 2024, Mother tested positive for marihuana, and in April, positive for cocaine and marihuana. Mother did not complete any drug tests after that time, even though tests were requested of her in June, July, twice in August, October, November, and December. Mother started parenting classes but did not complete them.

---

[26]The State began adopting community-based services at the direction of the Texas Legislature:

> In 2017, [the] Texas Legislature directed [the Department] to contract with community-based nonprofit and local governmental entities that can provide child protection services. These services must include direct case management to ensure child safety, permanency, and well-being in accordance with state and federal child protection goals. . . . The intent of the legislation is not to change the work done by caseworkers, but to shift from a state-run child protection system to a community-based system with more flexibility to develop services that reflect the local community and its needs.

TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., https://www.dfps.texas.gov/CBC/FAQ/default.asp (follow "Why is Texas adopting Community-Based Care (CBC)?" hyperlink) (last visited July 24, 2025).

> "On February 22, 2023, the Department . . . awarded a Community-Based Care contract in Piney Woods (Region 4) to 4Kids4Families, a division of Arrow Child and Family Ministries. Beginning March 1, 2023, the Office of Community-Based Care Transition, along with [the Department] [began] preparations with 4Kids4Families for the transition to Community-Based Care. . . . 4Kids4Families plan[ned] to receive its first child placement referral in early fall of 2023."

TEX. DEP'T OF FAMILY & PROTECTIVE SERVS., https://www.dfps.texas.gov/CBC/news-and-events/default.asp (follow "News Archive" hyperlink; then scroll to "February 2023") (last visited July 24, 2025).

On November 1, 2023, 4Kids4Families began Stage 1 of Community-Based Care in the Department's Region 4. "In Stage 1, 4Kids4Families . . . will continue to develop a service network in the community and provide foster care placement services." *Id.* (follow "New Archive" hyperlink; then scroll to November 2023) (last visited July 24, 2025).

The 4Kids4Families permanency specialist testified C.C. was removed from the home because he was not going to school and Mother did not have stable housing. At the time of the termination hearing, Mother still did not have stable housing, and she was not employed.

The CASA volunteer testified that she supported family reunification at the beginning of the case because Mother "was working really hard[,]" but as the case progressed, Mother "became less and less involved." The CASA volunteer stated that it became harder to get ahold of Mother, that Mother would not respond, and that Mother did not show an interest in or ask about C.C. The CASA volunteer said CASA switched its position from reunification to termination as Mother's "involvement became less and less" and "C.C. [got] settled and start[ed] thriving."

The CASA volunteer said C.C. initially struggled because he had missed so much school that he had huge gaps in his education. She said C.C. initially did not like school because he did not like consistency or rules. The CASA volunteer had concerns early in the case due to the other kids in the home, whom she thought had juvenile criminal allegations against them. She said it was not a "safe, stable environment" for C.C. to return to.

The CASA volunteer said Mother never asked for help with transportation to services or bus passes, though they had talked about the bus once, and Mother said she would figure it out. She said they also tried to tell Mother how to get her Social Security card—the volunteer testified that CASA "did due diligence on trying to help [Mother] with" any obstacle she raised to completing her services. The CASA volunteer said Mother did not have her own stable housing, did not have a phone number so she could be contacted, and did not have a job.

26

Ultimately, the CASA volunteer recommended termination of Mother's parental rights and stated termination was in C.C.'s best interest.

Mother testified at the termination hearing that she had been homeless for a little while within the past year, but that she was staying with a friend. She had not worked since June, when she lost the house where she was living with her roommate and the roommate's children due to conflict with her roommate. Mother said she got food from working DoorDash even though she did not have a vehicle. Mother could not state an average income from the DoorDash job, but that she got paid for each delivery and she could "make up to $60[.00] in one day or more." Mother testified she had "finished all but one parenting class" and "had been attending counseling," but in the six months prior to the hearing, all she had been doing was "trying to get [her life] back together." She stated she had done nothing on her service plan since July 1 because she had been "trying to figure out a place to live." Mother claimed it had been months since she had used any illegal drugs, and she said she had not used in November or December, but she could not give an exact date that she had last used.

Mother stated that her "life ha[d] been falling apart," and she was "just trying to figure out how to get it back together." She said, "[I]f you take [C.C.] then it's not going to happen." When asked if she could take care of C.C., she said, "I'm not asking for him to be given to me today to go home with me. I'm just asking for another chance to work it through."

The attorney ad litem for C.C. recommended that Mother's parental rights be terminated and stated that termination was in C.C.'s best interest.

The trial court granted termination of Mother's parental rights to C.C. on statutory grounds D, E, I, and P.

## C. Analysis

In light of an exacting review of the entire record with a healthy regard for the constitutional interests at stake, we find that the trial court could reasonably have formed a firm belief or conviction that the grounds D and E findings are true under the legal, factual, and holistic review principles set forth above. Regarding factual sufficiency, the disputed evidence contrary to termination—including evidence regarding the extent of the mother's drug usage, the involvement of unsuitable influences in the child's life, and the ability of the mother to provide a stable environment—is not so significant that the trial court could not have formed a firm belief or conviction in the truth of the Department's allegations regarding termination on grounds D and E. We set forth the following evidence that supports this conclusion.

Ground D focuses on evidence related to endangering factors in the child's environment. *See In re R.W.*, 627 S.W.3d 501, 510 (Tex. App.—Texarkana 2021, no pet.); TEX. FAM. CODE ANN. § 161.001(b)(1)(D). The evidence before the trial court indicates that Mother failed to provide C.C. with or to obtain stable housing for the duration of the FBSS proceeding and the removal. After C.C. was removed from Mother, Mother chose a living situation that included older children, with whom C.C. had occasionally lived prior to his removal. Those older children did not regularly attend school. Mother admitted those children had been babysitters for C.C. when she was at work. Mother did not express concern about C.C. spending time with those children; instead, she testified that the children were supposed to be getting their GEDs and

expressed frustration that the Department did not tell her beforehand that C.C.'s exposure to those children was a matter of concern to the Department. Mother lost that housing due to "conflict," and her unstable housing situation persisted.

At the time of the termination hearing, Mother was living in a friend's house. However, Mother's refusal to remain in contact with the Department resulted in the Department's inability to determine whether Mother's friend's house would provide a safe and stable environment for C.C.

Ground E examines endangering conduct by the parent or others. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Here, the evidence demonstrates that Mother failed to complete any of the required services under the FBSS service plan during the applicable two-month period. In addition, although Mother initially worked, Mother lost her job, and at the termination hearing, she reported only working sporadically for DoorDash, even though she did not have her own car. Mother's failure to establish safe and stable housing and her failure to secure an adequate income to support C.C. over a one-year span after his removal demonstrate a voluntary, deliberate, and conscious course of conduct and omissions that endangered C.C.

Mother testified she had held C.C. back a year in school, the year prior to the investigation, due to the number of days of school he missed. Mother attributed that situation to "moving back and forth from Blossom to Paris." The following school year, during the FBSS period, C.C. missed at least forty days of school in a three-month period. Mother said C.C. could not attend school because he had lice, but after she received treatment kits, C.C. still did not go to school. And rather than assisting C.C. in attending school, Mother transferred C.C. from a

29

school that would have provided bus transportation to a school she said he could not attend because she did not have transportation. Mother's failure to have C.C. educated also shows a voluntary, deliberate, and conscious course of conduct and omissions that endangered C.C. *See T.D. v. Tex. Dep't of Fam. & Protective Servs.*, 683 S.W.3d 901, 914 (Tex. App.—Austin 2024, no pet.) (citing *C.M.M. v. Dep't of Fam. & Protective Servs.*, Nos. 14-21-00702-CV & 14-21-00730-CV, 2022 WL 1789925, at *13 (Tex. App.—Houston [14th Dist.] June 2, 2022, pet. denied) (mem. op.)).

Mother initially admitted to using marihuana, which she tested positive for, and later she tested positive for marihuana and cocaine. Then she stopped complying with the Department's requests for drug tests altogether.[27] While Mother's illegal drug use alone does not suffice to show endangerment, her continued illegal drug use,[28] accompanied by the lack of safe, stable housing; the failure to secure income adequate to support C.C.; and the failure to consistently have C.C. attend school, establish a substantial risk of harm to C.C. It is apparent from these circumstances that Mother's continued drug use presented a risk to her ability to parent. *See In re R.R.A.*, 687 S.W.3d at 278.

After viewing all the evidence in the light most favorable to the grounds D and E findings, we conclude that the trial court could have reasonably formed a firm belief or conviction that the Department proved the requisites for terminating Mother's parental rights under statutory grounds D and E. We further conclude that any disputed evidence, viewed in

---

[27] *See In re of R.R.A.*, 687 S.W.3d at 281 ("Father had refused drug testing for nearly a year.").

[28] A fact-finder can reasonably infer that a parent is using drugs from that parent's refusal to submit to drug tests. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.); *In re A.V.*, 697 S.W.3d at 659 (termination supported by factors including continued drug use despite the pendency of termination proceedings).

light of the entire record, could have been reconciled in favor of the trial court's findings on these grounds or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights under these grounds was appropriate.

We overrule Mother's first issue.

Having made this determination as to grounds D and E, we need not review the trial court's findings under grounds I and P, *see In re C.E.*, 687 S.W.3d at 314. Therefore, we do not address Mother's second issue.

## III. The Best-Interest Finding

In her third issue, Mother challenges "[w]hether the Department presented legally and factually sufficient evidence to support the trial court's finding that termination was in C.C.'s best interest."

Even when the evidence supports termination on endangerment grounds, the outcome of the best-interest inquiry is not a foregone conclusion. *See In re R.R.A.*, 687 S.W.3d at 281. There, the court upheld termination on endangerment grounds, but then held, "Whether Father's bond with the children warrants further work toward reunification is most appropriately addressed in a best-interest determination." *Id.* However, though proof of statutory termination grounds "does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues." *In re C.H.*, 89 S.W.3d at 28; *see In re J.W.*, 645 S.W.3d at 747–48.

31

The first *Holley* factor requires that "the desires of the child" be taken into consideration. *Holley*, 544 S.W.2d at 372. At the termination hearing, the 4Kids4Families permanency specialist testified that C.C. did not want Mother to be out of his life. The 4Kids4Families permanency specialist further agreed that it was in C.C.'s best interest to not be with Mother at that time, but she did not think it was in his best interest to "just completely obliterate[] [Mother] from his life." We find that this factor does not support the trial court's best-interest finding.

The second and third *Holley* factors center around "the emotional and physical needs of the child" and "the emotional and physical danger to the child" both "now and in the future." *Id.* In this analysis, the trial court could consider the evidence regarding grounds D and E set forth above. That evidence establishes that Mother was not meeting the emotional and physical needs of C.C. and that she was exposing him to conduct of herself and others that placed him in emotional and physical danger.

Conversely, testimony indicated C.C., ten years old at the time of termination, was in a foster placement in which he was "doing really well." All his needs were being met, and the placement was safe and appropriate. The foster parents wanted to adopt him. C.C. was regularly attending school and making good grades. The CASA volunteer testified that C.C. had transformed throughout the course of the case due to consistency and stability. She said C.C.'s "face is more relaxed. He's calmer. . . . He's learning how to be 10."

Although Mother argues there is no evidence that she "would be totally unable to ensure that C.C. regularly attended school in the future[,]" there is also no evidence that she would. Nor is there evidence that she would be able to refrain from putting C.C. in emotional or physical

danger or meet C.C.'s emotional and physical needs now and in the future. Taking into account all the evidence cited above with respect to the second and third *Holley* factors, the record supports the trial court's determination as to best interest.

The fourth *Holley* factor regards "the parental abilit[y] of the [person] seeking custody," *id.*, and "we [may] consider Mother's past ability to care for [C.C.] as an indicator of future actions," *In re B.B.*, No. 06-24-00047-CV, 2024 WL 4448690, at *6 (Tex. App.—Texarkana Oct. 9, 2024, no pet.) (mem. op.). As noted above, Mother had held C.C. behind in school because he had missed so much the year preceding the Department's involvement. Then, during the investigation, C.C. continued to miss school for the entirety of almost a three-month period during FBSS. Mother did not complete the parenting classes required through her service plan. And even though Mother expressed desire to have contact with C.C., due to her positive drug tests and refusal to submit drug tests, Mother had no contact with C.C., other than through FaceTime, after he was removed. The record reflects Mother's long and persistent inability to parent. The evidence of this fourth *Holley* factor supports the trial court's determination regarding C.C.'s best interests.

Likewise, the fifth and sixth *Holley* factors—the "programs available to assist" persons seeking custody and their "plans for the child"—support the trial court's determination. *See Holley*, 544 S.W.2d 372. Although Mother's caseworker testified that Mother was court-ordered to complete substance abuse screening, counseling, parenting classes, a psychological evaluation, and random drug testing, Mother completed only the substance abuse screening that was ordered during FBSS —and then not until the conservatorship portion of the case. Mother started but did

33

not complete counseling and parenting classes and did not receive the benefit of any psychological services that might have been available to her because she did not complete the evaluation. Similarly, the record contains a paucity of evidence that Mother had any future plans for the child. She expressed only that she was willing to have someone else continue to care for C.C. while she continued to attempt to get her life back together.

The evidence of the seventh *Holley* factor—"stability of the home or proposed placement"—has been stated in part above, as Mother's job and home situation were unstable throughout the case. *See id.* Mother's drug use continued. The foster home where C.C. was placed, on the other hand, was meeting C.C.'s needs and provided no safety concerns, and the family wanted to adopt him. This evidence supports the trial court's determination regarding best interest.[29]

The eighth *Holley* factor examines whether the "existing parent-child relationship [was] . . . a proper one." *Id.* As outlined above, Mother had a history of failing to keep C.C. in school, and she allowed him to be watched at home by older children who themselves did not have a track record of diligent school attendance. Mother was unable to meet C.C.'s needs by securing a stable home or a job, and she admitted to drug use while C.C. was still in her custody. The testimony also establishes that, during the pendency of the case, Mother had no in-person visits with C.C., meaning by the time of the termination, she had not seen him in person in over a year. The evidence of this factor supports the trial court's best-interest determination.

---

[29]This is not to say that the *Holley* analysis can be collapsed into whether a potential alternative placement, in a momentary snapshot of time, appears in that moment to be preferable. As noted above, termination proceedings are permanent. *Stary*, 712 S.W.3d at 592 ("[T]he government seeks to end her exercise of a fundamental right.").

Finally, the ninth *Holley* factor includes a consideration of whether there is an excuse for Mother's acts or omissions. *See id.* Though testimony indicated Mother was initially "working really hard[,]" it also indicated that "as the case progressed . . . her involvement became less and less." Mother testified that she lost her job because she lost her housing due to the "[c]onflict with the mother that [she] was living with." When asked how she lived though she was not working, Mother responded simply, "I don't know." Mother further stated that she had done nothing on her service plan "because [she had] been trying to figure out a place to live." Asked to explain to the trial court why her rights to C.C. should not be terminated, Mother said, "[M]y life has been falling apart. I'm just trying to figure out how to get it back together. And *if you take him then it's not going to happen*." (Emphasis added). This aspect of Mother's testimony is similar to the testimony in *In re A.V.*, where the "[f]ather testified that the best way for the parents to stop using drugs was to return the child to them." *See In re A.V.*, 697 S.W.3d at 659. This ninth factor also supports the trial court's best-interest determination.

Having discussed the *Holley* factors in order, we conclude by noting that not all factors must be present. *In re C.H.*, 89 S.W.3d at 27.

After an exacting review of the entire record with a healthy regard for the constitutional interests at stake, we find that the trial court could reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in C.C.'s best interest under the legal and factual review principles set forth above. *See In re J.F.C.*, 96 S.W.3d at 266. Regarding factual sufficiency, the disputed evidence contrary to the best-interest finding—including Mother's ability to provide a stable environment—is not so significant that the trial court could

not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in C.C.'s best interest. *See id.* at 266–67. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

We overrule Mother's third issue.

## IV. Conclusion

We affirm the trial court's order terminating Appellant's parental rights.

Jeff Rambin
Justice

Date Submitted:    April 16, 2025
Date Decided:    July 30, 2025